**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NICOLETTE CREMEANS**, *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:19-cv-2703** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **SAMANTHA TACZAK**, *et al.*, | : | **Magistrate Judge Elizabeth P. Deavers** |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

This matter is before the Court on Plaintiffs' and Defendants' Cross-Motions for Summary Judgment (ECF Nos. 94 & 110), as well as Plaintiffs' Motion to Compel (ECF No. 112) and Defendants' Motion to Strike (ECF No. 131). For the reasons that follow, Plaintiffs' Motion for Summary Judgment is **DENIED**, and Defendants' is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' Motion to Compel and Defendants' Motion to Strike each are **DENIED**.

## I.  BACKGROUND

Plaintiffs Nicolette and James Cremeans bring this case against the City of Chillicothe and several of its police officers: Detective Samantha Taczak, Chief of Police Keith Washburn, and other Unknown Officers. (ECF No. 4). Plaintiffs allege violations of their constitutional rights under the Fourth and Fourteenth Amendments stemming from arrests, searches, and seizures executed by Defendants. The Amended Complaint states: "The arrests were warrantless and without probable cause, there was no search warrant for [Plaintiffs'] persons . . . and both the search warrant affidavit and search warrant were constitutionally defective." (*Id.* ¶ 35). It also alleges "Defendants' act in failing to return Plaintiffs['] property" violated their due process rights. (*Id.* ¶ 36).

## A.  Events of January 10, 2018

On January 10, 2018, Plaintiffs allege they both were arrested and detained by Chillicothe police officers. Mr. Cremeans was stopped by "Unknown" officers for a traffic violation, and the officers seized his cell phone and $1,080 in cash from his person. (ECF No. 4 ¶ 10; No. 110 at 5–6). Mrs. Cremeans was detained when she later arrived on the scene, and "Unknown" officers seized her cell phone and $715 she was carrying. (ECF No. 4 ¶ 15; No. 110 at 6). Detectives had been surveilling Plaintiffs in the days prior, on suspicion of a large drug trafficking operation. (*Id.* at 5; ECF No. 94-2). Plaintiffs were taken to the police station while officers obtained and executed search warrants for the Charles Street residence and an additional property Plaintiffs were in the process of purchasing (178 South Woodbridge Avenue). (ECF No. 4 ¶¶ 12–13, 15; No. 94-1; No. 110 at 6–7).

The Charles Street warrant related to suspected drug crimes but also authorized searching for currency, financial records, communication devices, and other items. (ECF No. 94-1). While officers did not find any drugs, they allegedly did seize $33,715 in cash[1] and the following items:

> one jar of quarters and rolled change, lease agreements, an old rare coin collection, bank statements and other financial documents, car and motorcycle titles, a cell phone, thumb drives, a camera, a hard drive, sim cards, financial documents, passports[,] and other property.

(ECF No. 4 ¶ 9).[2] Plaintiffs were released from the police station after the searches were complete. (ECF No. 110 at 7).

---

[1] This is the sum of two amounts stated in the Amended Complaint: "$9,715 in cash from different locations within the residence, [and] $24,000 from a safe." (ECF No. 4 ¶ 9). The parties disagree on the precise amount taken. *See infra* Section III.B.1.

[2] The Woodbridge Avenue warrant is not in evidence. Plaintiffs do not allege any items were taken from that property, which they did not yet own.

### B.  Replevin, Investigation, and Indictment

Over the following months, Plaintiffs demanded return of the seized property. (ECF No. 4 ¶ 29). Defendants refused, citing their ongoing investigation. (*Id.* ¶ 30). In September 2018, Plaintiffs brought an action for replevin or conversion in the Ross County Court of Common Pleas, Case No. 18 CI 412. The judge ordered Defendants to return the cell phone and $715 seized from Mrs. Cremeans but denied replevin as to "all other requested items . . . because there is an ongoing criminal investigation." (ECF No. 9-2). The judge amended his order *nunc pro tunc* to state that the dismissal was without prejudice. (Hr'g Ex. P-1).[3]

Defendants have outlined the timeline of their investigation as follows: (1) Officers execute the search warrant on January 10, 2018; (2) Officers obtain some tax records in February and March; (3) Detective Taczak subpoenas Plaintiffs' bank records in March; (4) Taczak receives partial response to bank subpoenas in April; (5) Taczak receives full response in June; (6) Officers investigate and compile their case against Plaintiffs from June to September; (7) Officers seek additional years of tax returns in October; (8) Officers submit the case to the Ross County Prosecutor in November 2018. (Hr'g Ex. D-3).

At the time Plaintiffs filed this suit on June 26, 2019, prosecutors had neither brought a formal forfeiture action nor charged them with any crimes. On July 12, 2019, days before this Court held a preliminary injunction hearing, the Ross County Prosecutor brought an indictment against Mr. Cremeans for "receiving proceeds of an offense subject to forfeiture proceedings," in violation of O.R.C. § 2927.21. (Hr'g Ex. D-4). That indictment did not include a separate forfeiture specification as required by O.R.C. § 2941.1417, nor had authorities initiated civil forfeiture

---

[3] All citations to "hearing exhibits" refer to documents received as evidence at this Court's preliminary injunction hearing on July 15 and 16, 2019. At the hearing, Plaintiffs also submitted audio recordings of the state-court case. This Court has heard the recordings in their entirety.

proceedings. On August 16, 2019, a state grand jury returned a new indictment against Mr. Cremeans, which included the following:

> SPECIFICATION: The grand jurors further find and specify that U.S. currency in the amount equal to $30,855.82 belonging to James D. Cremeans, specifically, the $1080.00 in U.S. currency seized from the person of the said James D. Cremeans, and the $29,775.82 in U.S. currency seized from the residence of the said James D. Cremeans, located at 463 Charles Street, Chillicothe, Ohio 45601 at the time of this offense, is subject to forfeiture.

(ECF No. 27-1).

The criminal charges and forfeiture specification against Mr. Cremeans were dismissed on November 19, 2020, under Ohio Rule of Criminal Procedure 29 ("Motion for Acquittal"). (ECF No. 70; No. 110 at 9).

### C.  Procedural History

Plaintiffs' case has a lengthy procedural history in this Court. On July 2, 2019, the Court partially granted Plaintiffs' request for a temporary restraining order, finding "a plausible claim for a constitutional violation" due to Defendants' delay in bringing a formal forfeiture action. (ECF No. 11 at 4). The Court ordered Defendants to "hold the Plaintiffs' property in trust" and to "refrain from diminishing, testing, or engaging in any spoliation of the property until this Court rules on the Preliminary Injunction." (*Id.*). The Court held a preliminary injunction hearing on July 15 and 16, 2019, and found for Plaintiffs. While acknowledging that "[t]he Chillicothe Police Department acted diligently in investigating the case," the Court was "at a loss to comprehend the state's failure to file in a timely manner civil forfeiture or request forfeiture in the first indictment." (ECF No. 31 at 20, 24). Defendant appealed. (ECF No. 32).

On April 7, 2020, the Court granted Plaintiffs' motion to enforce the preliminary injunction. (ECF No. 45 at 8–9). The Court partially stayed that order "as to the $30,855.82 listed in the August 2019 forfeiture specification . . . pending resolution of the appeal." (*Id.* at 8). All

4

other property was to be returned without delay, "including cash in the amount of $2,859.18" (*i.e.*,

the difference between the sum Plaintiffs allege was seized and the amount listed in the forfeiture

specification) and the following items:

> one jar of quarters and rolled change, lease agreements, an old rare coin collection,
> bank statements and other financial documents, car and motorcycle titles, a cell
> phone, thumb drives, a camera, a hard drive, sim cards, financial documents, car
> keys, passports[,] and other property.

(*Id.* at 8–9).

Defendants did not return the cash and coins immediately, so the Court set a show-cause

hearing. Defendants argued "that they [were] unable to comply . . . because some of the specific

property that was listed—the rolled coins and change and the rare coin collection—were included

in the sum total of the forfeiture specification." (ECF No. 58 at 4). In an order dated May 12, 2020,

the Court found Plaintiffs had not offered evidence of the total amount of cash allegedly taken, so

it excused Defendants from returning the $2,859.18. (*Id.* at 4–5). The Court reiterated its order to

"turn over all physical property"—including the coins, since that particular property was not

described in the forfeiture specification. (*Id.* at 5). Defendants reported, with video evidence to

verify, that they surrendered the rolled and rare coins shortly before that order issued and the jar

of quarters shortly after. (ECF No. 63).

Once the criminal charges against Mr. Cremeans were dismissed in state court, Defendants

voluntarily dropped their appeal. (ECF No. 71). Defendants ultimately notified the Court on March

22, 2021, that they had "transferred $30,191.00 to Plaintiffs' counsel"[4] and were "no longer

---

[4] This represented the cash remaining after Defendants returned the coins. Since Defendants had
included the coins in their original calculation, they no longer held the full $30,855.82 listed in the
forfeiture specification.

holding any of Plaintiffs' personal property or currency." (ECF No. 86 (emphasis original)). Defendants attached a signed property return form as evidence. (ECF No. 86-1).

On August 2, 2021, Plaintiffs filed their Motion for Summary judgment (ECF No. 94). Defendants filed a combined response brief and cross-Motion for Summary Judgment on December 9, 2021 (ECF No. 110). Plaintiffs combined their response and reply brief (ECF No. 123), and Defendants filed a final reply (ECF No. 130). Separately, Plaintiffs moved to compel discovery (ECF No. 112), and Defendants moved to strike a portion of Plaintiffs' summary judgment briefing (ECF No. 131). All these matters stand ripe for adjudication.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. Evidence that is "merely colorable" or "not significantly probative" will not defeat summary judgment. *Id*. at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion, as well as "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to

produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

"The Court views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Even so, "[t]he mere existence of a scintilla of evidence to support [the nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).

## III.   LAW AND ANALYSIS

### A.  Fourth Amendment (Count I)

Count I of the Amended Complaint states claims under the Fourth Amendment and 42 U.S.C. § 1983 for unlawful search and seizure of Plaintiffs' property, as well as unlawful arrest and detention. The Court will address these claims separately.

#### 1.  Search and Seizure

First, Plaintiffs seek summary judgment on their claims stemming from the search warrant executed at their property on January 10, 2018. Plaintiffs argue that the search warrant failed to meet the particularity requirement and that the accompanying affidavit did not establish probable cause. (ECF No. 94 at 7–17). Plaintiffs also request a *Franks* hearing on whether Detective Taczak fabricated information in the affidavit. (*Id.* at 11 n. 4). Defendants likewise seek summary judgment on the search warrant claims. They contest Plaintiffs' attacks on the warrant and affidavit and add a qualified immunity defense. (ECF No. 110 at 21–23, 30–32).

The search warrant and affidavit at issue are attached to Plaintiffs' Motion. (ECF Nos. 94-1 & 94-2). The warrant, issued on January 10, 2018, by Judge John Street of the Chillicothe

Municipal Court, authorized a search of Plaintiffs' residence at 463 Charles Street for evidence of drug trafficking, possession of controlled substances, and drug paraphernalia offenses. (ECF No. 94-1). It specifically identified the following items: drugs, drug abuse instruments, and drug paraphernalia; records, ledgers, or documents representing the proceeds of drug trafficking; employment records; monies, including bank records, cryptocurrency documents, checks, jewelry, and U.S. currency; weapons; photographs of other assets or co-conspirators; safe deposit keys and lock boxes; cell phones and other electronic communication devices; vehicles located at the premises; and documents showing ownership of the residence. (*Id.*). The warrant also authorized officers to take photographs, video recordings, and fingerprints of any adult subjects found inside the premises. (*Id.*).

Detective Taczak signed the accompanying search warrant affidavit. According to the affidavit, the Chillicothe Police Department had received citizen complaints "that James D. Cremeans is selling illegal drugs in the city," and had learned from confidential informants "that Mr. Cremeans purchases kilograms of Cocaine from Mexican Nationals and sells it within the city." (ECF No. 94-2). Detective Taczak recounted information received from the Miami Valley Task Force "[w]ithin the past four months" regarding a traffic stop of a suspected drug dealer, who was found with "several kilograms of Cocaine." The driver "admitted to delivering a kilogram of Cocaine to 463 Charles St.," and the GPS confirmed the vehicle had stopped on Charles Street before travelling to the Dayton area. (*Id.*). Detective Taczak then discussed a traffic stop of Mr. Cremeans "[o]ver the last four weeks" (distinct from the stop on January 10), where he was arrested for possession of cocaine. (*Id.*). "The bag of suspected Cocaine appeared to have come from the corner of a kilogram due to the being pressed [*sic*]." (*Id.*). When Mr. Cremeans's phone was searched pursuant to a separate warrant, it showed phone calls and text messages to Mexican

numbers, and text messages to a Texas number organizing payments. (*Id.*). The affidavit noted Mr. Cremeans's Bitcoin account as a possible means of money laundering, as well as his purchase of the Woodbridge Avenue property, potentially for stashing cash or drugs. (*Id.*). Finally, Detective Taczak summarized the results of the surveillance that had begun on January 8, 2018. Detectives observed foot traffic at 463 Charles Street "consistent with drug trafficking," as well as several short car trips by Mr. Cremeans and an unidentified passenger consistent with drug deliveries. (*Id.*). Officers stopped Mr. Cremeans on one such trip (this being the January 10 stop), where he was found with "a large amount of cash on his person," and his passenger was found with "illegal pills." (*Id.*).

### a.  Particularity and Breadth

Plaintiffs claim the warrant was "overbroad" in that it "provided officers authority to search and seize items that are not listed in the search warrant affidavit nor relevant to claims made in the search warrant affidavit." (ECF No. 94 at 7). The Fourth Amendment guarantees "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Ohio's Constitution contains a near identical guarantee. *See* Ohio Const. art. I, § 14. "A general order to explore and rummage through a person's belongings is not permitted." *United States v. Ford*, 184 F.3d 566, 575 (6th Cir. 1999) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991)). A warrant may be found "too broad" where "it includes items that should not be seized." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (quoting *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999)). "However, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought. Thus a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit."

*United States v. Ables*, 167 F.3d 1021, 1033 (6th Cir. 1999) (quoting *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988)).

Plaintiffs quarrel with the inclusion of jewelry, money held in retirement or brokerage accounts, employment records, and electronic communication devices (ECF No. 94 at 9); but these fall squarely within the scope of possible evidence for a suspected drug trafficking operation. At the preliminary injunction hearing, Defendants explained how financial and employment records related to their theory of the case—that Plaintiffs only could have amassed such large cash reserves through drug dealing. Electronic communication devices could have contained other evidence of trafficking—like the Mexican phone contacts found in an earlier search of Mr. Cremeans's cell phone. (*See* ECF No. 94-2). Jewelry and financial accounts represented possible proceeds of drug trafficking; and in any event, Plaintiffs do not allege those items actually were searched or seized. (*See* ECF No. 4 ¶ 9 (listing seized items)). *See also Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001) ("there would be no harm from an alleged defect in the warrant" where plaintiffs did not establish the item was, in fact, searched). Plaintiffs' argument about the warrant's fingerprint authorization (ECF No. 94 at 8) falters on the same basis, as there is no allegation Plaintiffs were fingerprinted at the residence. On the contrary, Plaintiffs claim they were detained at the police station while the search transpired. (ECF No. 4 ¶¶ 10, 12, 15).

In sum, Plaintiffs have not demonstrated that the search warrant was overbroad or lacking in particularity. The warrant named the items to be searched, with as much specificity as was feasible in that early state of the investigation. *See Ables*, 167 F.3d at 1033. All items related to the drug trafficking offense specified in the warrant, either as direct evidence or possible proceeds. As such, the warrant did not grant "*carte blanche*" (ECF No. 94 at 9) to "rummage through a person's belongings." *Ford*, 184 F.3d at 575. Nor did it approach the problematic overbreadth of the cases

cited in Plaintiffs' Motion. *See id.* (warrant could not authorize "seizure of all financial documents in the buildings, whether or not related to the [investigated conduct] in time or subject matter"); *State v. Castagnola*, 46 N.E.3d 638, 657–58 (Ohio 2015) (warrant could not authorize police "to examine every record or document on Castagnola's computer in order to find any evidence of the alleged crimes"). On this theory, Plaintiffs have not stated a viable claim.

### b.  Probable Cause

Additionally, Plaintiffs argue that Detective Taczak's affidavit in support of the search warrant failed to establish probable cause and contained lies provable in a *Franks* hearing. (ECF No. 94 at 9–17). Defendants maintain the affidavit was sufficient. (ECF No. 110 at 21–22).

An affidavit supplies "probable cause" for a search warrant if it shows "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "There must, in other words, be a *nexus* between the place to be searched and the evidence sought." *Id.* (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)). Where a detached magistrate judge has found probable cause, a reviewing court should pay "great deference" to that determination. *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). Relatedly, courts should "recognize[] that affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation,'" and should not impose "'[t]echnical requirements of elaborate specificity.'" *Id.* at 235–36 (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). "In deciding whether probable cause exists, [courts] must examine the totality of the circumstances in a 'realistic and commonsense fashion.'" *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (quoting *United States v. Finch*, 998 F.2d 349, 352 (6th Cir. 1993)).

A *Franks* hearing, named after the case *Franks v. Delaware*, 438 U.S. 154 (1978), allows

a criminal defendant "to prove his allegations that officers had made false statements in their search

warrant affidavits." *Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). As the Sixth Circuit

recounted:

> The Supreme Court determined that the Fourth Amendment's exclusionary rule
> allowed a defendant, in narrow circumstances, to attack the veracity of a search
> warrant affidavit. [*Franks*, 438 U.S.] at 164–65, 98 S.Ct. 2674. The Court, however,
> carefully circumscribed the opportunity to do so, recognizing the need to give
> respectful deference to a magistrate's probable cause determination. *Id*. at 166–67,
> 98 S.Ct. 2674. The bottom line was that an evidentiary hearing on the affidavit's
> truthfulness was required *only* if the defendant alleged "deliberate falsehood or . . .
> reckless disregard for the truth." *Id*. at 171, 98 S.Ct. 2674. "Allegations of
> negligence or innocent mistake," the Court emphasized, would be "insufficient."
> *Id*. And the allegations of deliberate or reckless falsehood "must be accompanied
> by an offer of proof." *Id*. Even having satisfied these steps, a defendant must still
> show that "when material that is the subject of the alleged falsity or reckless
> disregard is set to one side," the affidavit's remainder no longer demonstrates
> probable cause. *Id*. at 171–72, 98 S.Ct. 2674. Only then is a defendant entitled to a
> *Franks* hearing to prove his allegations. *Id*. at 172, 98 S.Ct. 2674.

*Butler*, 936 F.3d at 418.

Plaintiffs' request for a *Franks* hearing in this Section 1983 case is procedurally improper.

*Franks* arose in the criminal context, and Plaintiffs cite no cases (nor has this Court identified any)

suggesting such a hearing is available here. The *Franks standard* extends to Section 1983, where

it bears on a police officer's entitlement to qualified immunity. *See id.* at 417–19 ("To overcome

an officer's entitlement to qualified immunity, a § 1983 plaintiff must make a substantial showing

that the defendant stated a deliberate falsehood or showed reckless disregard for the truth."

(internal quotation marks omitted)). The *Franks hearing* does not. *See, e.g.*, *Sims v. Biggart*, 2014

WL 3401983, at *5 (W.D. Mich. July 10, 2014) ("A section 1983 action, such as this, is an

inappropriate vehicle for seeking a *Franks* hearing." (internal quotation marks omitted)); *Lockard

v. Bray*, 2022 WL 1504809, at *6 (E.D. Mich. May 12, 2022) ("In general, the question of probable

cause in a section 1983 action is one for the jury, unless only one reasonable determination is possible."). Accordingly, the Court will proceed without a *Franks* hearing.[5]

On the evidence submitted, there is no genuine dispute that Detective Taczak's affidavit supplied probable cause for the search warrant. Plaintiffs attempt to debunk almost every paragraph of the affidavit, but they submit no objective evidence of its falsehood. Plaintiffs criticize the citizen complaints for being anonymous, unverifiable, and unconnected to the Charles Street residence (ECF No. 94 at 10–11); the confidential informants for failing to state how they learned of Mr. Cremeans's alleged cocaine purchases (*Id.* at 11–12); the Miami Valley Task Force tip for being stale and for not yielding any arrests (*Id.* at 12–14); the "Mexican National" for being uncredible (*Id.* at 14); the first traffic stop for being stale and for inferring that a bag of cocaine had come from a kilogram (*Id.* at 14–15); the Mexican phone calls for possibly being discovered without a search warrant (*Id.* at 15); and the Bitcoin usage and property purchase as having plausible innocent explanations (*Id.* at 16–17). Several of these criticisms misrepresent the affidavit. For instance, the affidavit clearly states that a warrant *was* obtained to search Mr. Cremeans's cell phone; and it shows that the word of the "Mexican National" (who admitted to delivering a kilogram of cocaine to 463 Charles Street) was objectively corroborated by his GPS. (ECF No. 94-2). Plaintiffs also fail to make any mention of the police surveillance activities in the days immediately prior to the warrant, which showed foot traffic and driving routes "consistent with drug trafficking." (*Id.*).

More troublesome, though, is Plaintiffs' choice to question each piece of the affidavit in isolation, missing "the totality of the circumstances." *Van Shutters*, 163 F.3d at 336. It is easy to

---

[5] Plaintiffs' hearing request is all the more perplexing considering they deposed Detective Taczak on the veracity of her affidavit. (*See* ECF No. 118 (Taczak dep.)).

say that, *standing alone*, a four-month-old tip from the Miami Valley Task Force is stale, or a confidential informant is unverified. Viewed as a whole, however, the affidavit gives a clear picture of an ongoing drug trafficking operation, with supplier contacts in Mexico, bulk deliveries, and sales out of the Charles Street residence. It provided at least "a fair probability," *Brown*, 828 F.3d at 381, that current drug shipments or proceeds of previous drug sales would be found at the property. *See also United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) ("in the case of drug dealers, evidence is likely to be found where the dealers live" (internal quotation marks omitted)).

Plaintiffs' efforts to impeach Detective Taczak likewise fall short. Plaintiffs juxtapose Detective Taczak's testimony at the preliminary injunction hearing, that she did little investigating prior to the search warrant (*see* ECF No. 36, Tr. 37:6–39:24), with her testimony before the state-court judge "that she was the LEAD INVESTIGATOR . . . and a member of the federal Drug Task Force in January 2018." (ECF No. 123 at 23 (emphasis original, citing state-court audio recording)). These ideas are not in conflict. As Detective Taczak explained at the preliminary injunction hearing, she "held off on the investigation so that Miami Valley Task Force could complete theirs." (ECF No. 36, Tr. 38:24–25; *see also id.* at 60:24–61:11 (Taczak test., explaining the risks posed to undercover officers when one agency interferes with another's investigation)).

Beyond the sweeping claims of "prevarication" and "bamboozl[ing]" (ECF No. 94 at 12), the only evidence Plaintiffs offer to support their version of events is their own affidavits. (ECF Nos. 94-3, 94-4). "Self-serving affidavits alone, however, are not enough to create an issue of fact sufficient to survive summary judgment." *Am. Nat'l Prop. & Cas. Co. v. Williamson*, 547 F. Supp. 3d 741, 750 (S.D. Ohio 2021). Defendants' arguments, on the other hand, are well taken. Probable cause is apparent on the face of the two documents, and Plaintiffs have not submitted adequate

evidence to the contrary. Thus, the Court finds no genuine triable issue regarding the preparation

or execution of the search warrant. Defendants are entitled to summary judgment on those claims.[6]

## 2. *Arrest and Detention*

The parties also seek summary judgment on Plaintiffs' Fourth Amendment claims relating

to their arrest and detention while the warrant was executed. (ECF No. 94 at 17–19; No. 110 at

23–30). Though Defendants resist the characterization of an "arrest," most of the underlying facts

are clear. On January 10, 2018, prior to issuance of the search warrant, police performed a traffic

stop on Mr. Cremeans. (ECF No. 94 at 2; No. 110 at 5). Officers found Mr. Cremeans in possession

of a large amount of cash, and they transported him to the police station on suspicion of drug

trafficking. (ECF No. 94 at 2; No. 110 at 6). Mrs. Cremeans later arrived at the scene of the traffic

stop and attempted to enter the vehicle Mr. Cremeans had been driving. (ECF No. 36, Tr. 14:3–8;

No. 110 at 6). According to Defendants, Mrs. Cremeans was detained and transported to the police

station on suspicion of "trying to remove or destroy evidence" in the car. (*Id.*).[7] Money and cell

phones were seized from Plaintiffs' persons. (ECF No. 94 at 2–3). Police obtained the search

warrant for 463 Charles Street while Plaintiffs were at the station, and Plaintiffs were released after

it was executed. (*Id.* at 2; ECF No. 110 at 7).

Plaintiffs' arrest and detention claims suffer a threshold defect, raised in Defendants'

Motion: all conduct is attributed to "Unknown Officers." (*Id.* at 23–28; *see* ECF No. 4 ¶¶ 10, 12,

---

[6] The Court need not reach Defendants' qualified immunity argument on Count I. *See Mays v. City of Dayton*, 134 F.3d 809, 813 (6th Cir. 1998) ("In this case, if the court determines that [defendant] had probable cause sufficient to obtain a search warrant, plaintiffs' § 1983 claim fails, and the issue of whether [defendant] receives qualified immunity becomes moot.").

[7] Plaintiffs represent that Mrs. Cremeans's mother, Tammy Tyler, was arrested and detained with her. (ECF No. 94 at 2, 17). The Court does not consider these claims, as Ms. Tyler is not a party to this case and never is mentioned in the Amended Complaint.

15). They in fact were Officers Shipley and King (*see* ECF No. 110-1 (decl. of Matthew Shipley), No. 110-2 (decl. of Chris King)), neither of whom is named in the Amended Complaint. Since "[p]ersonal involvement is necessary to establish section 1983 liability," *Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) (citing *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991)), neither Detective Taczak nor Chief Washburn can be liable for these detentions. Plaintiffs' response brief belatedly claims the detentions were "ordered" by Detective Taczak (ECF No. 123 at 26), but this cannot substitute for well-pled allegations in the complaint. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent [a party] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment").

The claims also cannot persist against "Unknown Officers." Such a designation "is not favored in the federal courts," though "it is permissible when the identity of the alleged defendant is not known at the time the complaint is filed and plaintiff could identify defendant through discovery." *Yates v. Young*, 772 F.2d 909 (table), 1985 WL 13614, at *1 (6th Cir. Aug. 28, 1985) (citing *Schiff v. Kennedy*, 691 F.2d 196 (4th Cir. 1982); *Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980); and *Maclin v. Paulson*, 627 F.2d 83 (7th Cir. 1980)). Defendants reproduce portions of Plaintiffs' depositions—which Plaintiffs do not rebut—showing that Plaintiffs knew the officers' identities long ago. (*See* ECF No. 110 at 25–26). Yet, Officers Shipley and King were not substituted for the "Unknown Officers," and now it is too late. The Court's deadline has passed (*see* ECF No. 93 (amendment or joinder to be filed by July 20, 2021)), as has the two-year statute of limitations. *See Browning v. Pendleton*, 869 F.2d 989, 990 (6th Cir. 1989) (statute of limitations in Section 1983 actions is that of the state where the action arose; in Ohio, two years); *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996) (naming "Unknown Officers" does not toll the statute of limitations); *Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012) ("relating back"

provision of Fed. R. Civ. P. 15(c) is inapplicable to such a substitution). This leaves no viable defendants for the arrest and detention claims.[8]

* * *

For these reasons, Plaintiffs' claims for unconstitutional search, seizure, arrest, and detention are not viable. Summary judgment for Defendants is appropriate. On Count I, Defendants' Motion for Summary Judgment is **GRANTED**, and Plaintiffs' is **DENIED**.

### B. Fourteenth Amendment (Count II)

Count II of the Amended Complaint concerns Defendants' failure to return the seized property or initiate timely forfeiture proceedings, which Plaintiffs aver violated the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. Plaintiffs seek summary judgment, resting mostly on their arguments at the preliminary injunction stage. (*See* ECF No. 94 at 19–20). Defendants, on the other hand, argue that the Fourteenth Amendment claims are barred by absolute or qualified immunity, that no Defendant personally caused a due process violation, and that Plaintiffs had adequate state remedies available. (ECF No. 110 at 9–21).

The Court will structure its analysis around these defenses. First, though, a subsidiary issue requires attention. It is one that long has vexed this Court: whether Defendants returned *all* the property seized on January 10, 2018.

---

[8] The deficient pleading of "Unknown Officers" would not necessarily absolve the City of any liability for the arrests and detentions those officers made. The problem, again, is that allegations about the arrests and detentions concern *only* those Unknown Officers. The Amended Complaint's sole mentions of the City or its policies are in reference to the delay claims in Count II. (*See* ECF No. 4 ¶¶ 25, 29–30, 34). Plaintiffs attempt to add new Fourth Amendment "policy and procedure" claims in their response brief (ECF No. 123 at 31–32); but this comes too late. *See Bridgeport Music*, 508 F.3d at 400.

*1. Missing Property*

The parties continue to debate whether any property remains unaccounted for. This issue is of some consequence: if any property remains in Defendants' custody, the delay now exceeds *55 months*, with serious due process implications. Defendants state that the last of Plaintiffs' property was returned on March 22, 2021, mooting Plaintiffs' injunctive claims. (ECF No. 86; No. 110 at 9). Plaintiffs, however, believe that thousands of dollars remain missing. (ECF No. 123 at 33–35). In a separately filed Motion, they seek to compel production of a bank receipt dated January 11, 2018, as evidence of the true amount seized. (ECF No. 112).

According to the Amended Complaint, Defendants seized $34,795 in cash—$33,715 from the Charles Street residence ($24,000 "from a safe" and $9,715 "from different locations"), and $1,080 from Mr. Cremeans at the traffic stop—as well as "one jar of quarters and rolled change . . . [and] an old rare coin collection" in unspecified amounts. (ECF No. 4 ¶¶ 9–10).[9] The forfeiture specification, however, listed only $30,855.82: the sum of $1,080 seized from Mr. Cremeans and $29,775.82 seized from the residence. (ECF No. 27-1). This Court initially ordered Defendants to return the difference of $2,859.18 (ECF No. 45 at 7); but, on their motion to clarify, the Court accepted Defendants' argument "that they never seized $2,859.18 above the amount listed in the August 2019 forfeiture specification, and that the amount listed in the forfeiture specification included all of the cash seized, as well as the sum of the rare coin collection and unspecified coinage that the Court ordered Defendants to turn over." (ECF No. 58 at 2). "[B]ecause Plaintiffs did not establish by testimony or other evidence the full amount of cash they allege was taken," the Court found "they [were] not entitled to request the return of the difference between what they

---

[9] Another $715, seized from Mrs. Cremeans upon her detainment, was returned through the state-court replevin action and is excluded from this figure. (*Id.* ¶¶ 15–16).

allege was taken and what was listed in the forfeiture specification, the $2,859.18 at issue . . . ." (*Id.* at 4).

Plaintiffs' evidence on this issue remains weak. First, Plaintiffs urge the Court to treat the Amended Complaint itself as an affidavit, since it is verified. (ECF No. 120 at 1 n.1). *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (allegations of a verified complaint "'have the same force and effect as an affidavit' for purposes of responding to a motion for summary judgment" (quoting *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992))). Each Plaintiff also submitted several affidavits, with Mrs. Cremeans stating: "I estimate that over $50,000 was in the house on January 10, 2018 . . . . I know it was at least $35,000 in the home." (ECF No. 94-4 ¶ 3). She also attested that "Detective Taczak listed $6000 seized from my bedroom drawer, when the amount seized was $7,500." (ECF No. 123-1 ¶ 8).[10] Mr. Cremeans stated that, because he "never received any receipts nor an inventory sheet listing the exact amount" seized, he had "never provided an exact amount of the currency that [he] possessed in [his] home on January 10, 2018." (ECF No. 123-2 ¶ 2). Thus, he explained, the amount stated in the Amended Complaint was "the last known amount that was actually seized by Defendants from [his] home." (*Id.*). Mr. Cremeans attested, "[b]ased upon belief and information," that he "possessed $50,000 or more in cash at the home on that day." (ECF No. 94-3).

These statements are vague and somewhat contradictory. Plaintiffs "verified" in the Amended Complaint, with no qualifiers or approximations, that the amount taken from the home was $33,715. (ECF No. 4 ¶ 9). Later, they swore that it was "never . . . an exact amount." (ECF

---

[10] At the preliminary injunction hearing, Mrs. Cremeans provided a bank withdrawal slip for $7,500, dated approximately two months before the search. (Hr'g Ex. P-3). Given the lapse of time, this withdrawal slip is only minimally probative of the amount that remained on January 10, 2018, much less where it was located within the house.

No. 123-2 ¶ 2). They still have not explained *how* they knew the amount was "at least $35,000" (ECF No. 94-4 ¶ 3), nor why they chose to verify $33,715 instead. Moreover, "[s]elf-serving affidavits alone . . . are not enough to create an issue of fact sufficient to survive summary judgment." *Am. Nat'l Prop. & Cas. Co.*, 547 F. Supp. 3d at 750.

Defendants, on the other hand, provide the "case jacket," which lists $31,570.82 in "US currency, old coins, [and] stamps"—*i.e.*, the forfeiture amount of $30,855.82 plus the $715 returned to Mrs. Cremeans. (Hr'g Ex. D-1). They also account for chain of custody via the "Evidence/Property Record Form." (ECF No. 86-1). To be clear, Defendants deserve some demerits for their record-keeping. This issue could have been avoided entirely had they simply itemized the seized currency, provided Plaintiffs with a receipt, and stated whether the forfeiture amount was inclusive or exclusive of the change and coin collection. Nonetheless, the documentary evidence supports Defendants' claim that all money seized on January 10, 2018, has been returned.

 Plaintiffs would have the Court reopen discovery so they can obtain "[t]he best evidence of the amount [Defendants] seized": the elusive bank receipt that is the subject of their Motion to Compel. (ECF No. 112; No. 120 at 2). Defendants, referring to Detective Taczak's deposition, maintain that "any record from the bank count was sealed in the evidence bags and thus returned to Plaintiffs when those bags were unsealed, and the currency was returned to them on March 19, 2021." (ECF No. 115 at 1). Plaintiffs claim not to have the receipt. (ECF No. 120 at 2).

The problem, though, is that Plaintiffs' Motion is not timely. Written discovery ended four months prior (*see* ECF No. 93 (deadline of August 21, 2021)); and courts routinely decline to compel discovery after it has closed. *See Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 642–43 (6th Cir. 2018) (collecting cases). Plaintiffs' alternative request for a "spoliation order" (ECF

No. 112 at 1) likewise is untimely: "Generally, a plaintiff may not raise a claim for spoliation of evidence for the first time in opposition to a defendant's motion for summary judgment." *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 451 (6th Cir. 2007). Nor have Plaintiffs justified their delay in raising the issue. Their reply emphasizes Defendants' answer, "N/A," in September 2019 to the request for production of "any deposit slips, receipts and/or any other bank records which reflect the deposit or withdrawal of the cash seized from Plaintiffs' residence or persons." (ECF No. 120 at 3; No. 120-1 at 7). Yet, "[a]s far back as the Replevin Hearing held before Ross County Common Pleas Court Judge Ater [which occurred in fall 2018], Defendant Taczak testified that she took money seized from Plaintiffs' home to a bank to be counted and received a receipt." (ECF No. 112 at 2 (footnote omitted)). This discrepancy was known by September 2019, when Defendants served their discovery responses. The Motion to Compel finally came on December 21, 2021, in response to Defendants' summary judgment motion—and months after Detective Taczak's deposition, where the issue was discussed at length. (ECF No. 118, Tr. 72:9–75:13, 82:11–85:17).[11]

This Court cannot continue chasing the vermillion kipper of Plaintiffs' missing currency. Absent additional evidence that it now is too late to adduce, Plaintiffs have not framed a genuine dispute of material fact on the amount seized. Their Motion to Compel is **DENIED**, and the issue is resolved for Defendants.

---

[11] Detective Taczak's deposition was held September 13, 2021. By agreement of the parties, some depositions occurred shortly after the close of written discovery.

2. *Immunity*

a. Absolute Immunity

This brings the Court to Defendants' Motion for Summary Judgment, beginning with their argument for absolute prosecutorial immunity. The doctrine of prosecutorial immunity originates at common law and was extended to Section 1983 by the case *Imbler v. Pachtman*, 424 U.S. 409 (1976). Defendants are not themselves prosecutors; but courts take "a functional approach, which looks to the nature of the function performed, not the identify of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (internal quotation marks and citations omitted).

Defendants contend that, in "holding the property and currency on behalf of the Ross County Prosecutor pending indictment," they were performing a "ministerial act . . . not related to a police investigation function, but rather a prosecutorial function." (ECF No. 110 at 10). In support, Defendants cite two cases extending absolute immunity to law enforcement officers performing prosecutorial functions: *Briscoe v. Lahue*, 460 U.S. 325 (1983), immunizing a police officer for allegedly perjured testimony at the plaintiff's criminal trial; and *Rehberg v. Paulk*, 566 U.S. 356 (2012), with similar facts but before a grand jury. (*See* ECF No. 110 at 10). Neither of these cases is squarely on point, so Defendants also attempt to extend a general proposition from *Buckley*:

> A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity. See *Burns* [*v. Reed*], 500 U.S. [478,] 494–496, 111 S.Ct. [1934,] 1943–1944 [(1991)]. We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

509 U.S. at 273. Thus, Defendants reason, "if the Prosecutor is entitled to immunity for the evaluation of evidence assembled by the police, it follows that the police are immune from suit based on their assembly and retention of that evidence to facilitate the prosecutor's evaluation of the evidence and preparation for trial." (ECF No. 110 at 11).

That assertion—which is the lynchpin of Defendants' absolute immunity argument—is without attribution, and the Court is not persuaded that such an extension is warranted. While *Buckley* does grant immunity to certain preparatory acts, it also makes clear that those acts must relate to the prosecutor's "role as an advocate." *Buckley*'s reasoning does not extend plainly to the ministerial act of holding evidence, as opposed to "professional evaluation of the evidence" and "preparation for its presentation . . . *after* a decision to seek an indictment has been made." *Buckley*, 509 U.S. at 273 (emphasis added).

Furthermore, extensions of absolute immunity are not made lightly: "Not surprisingly, [the Supreme Court has] been 'quite sparing' in recognizing absolute immunity for state actors in [the Section 1983] context." *Id.* at 269 (quoting *Forrester v. White*, 484 U.S. 219, 224 (1988)). The hesitation is even greater where, as here, the act to be immunized occurs pre-indictment. "[O]ne of the most important checks, the judicial process, will not necessarily restrain out-of-court activities by a prosecutor that occur prior to the initiation of a prosecution . . . . This is particularly so if a suspect is not eventually prosecuted. In those circumstances, the prosecutor's action is not subjected to the 'crucible of the judicial process.'" *Burns*, 500 U.S. at 496 (quoting *Imbler*, 424 U.S. at 440 (White, J., concurring)). Sixth Circuit cases, raised in Plaintiffs' response brief, lend strong support to that point. *See Spurlock v. Thompson*, 330 F.3d 791, 801 (6th Cir. 2003) (rejecting absolute immunity where conduct "was not intimately associated with the judicial process"); *Prince v. Hicks*, 198 F.3d 607, 613 (6th Cir. 1999) (same; "these allegations refer to conduct that

occurred while [the prosecutor] performed administrative and investigative functions that were not intimately associated with the judicial phase of the criminal proceedings").

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486. Defendants have not met that burden, so their argument for absolute immunity must be rejected.

b. Qualified Immunity

Though absolute immunity is unavailable, "[q]ualified immunity 'represents the norm' for executive officers." *Buckley*, 509 U.S. at 273 (quoting *Malley v. Briggs*, 475 U.S. 335, 340 (1986)). Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a qualified immunity defense is asserted, the burden shifts to the plaintiff to show the official is not entitled to it. *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991) (citing *Poe v. Haydon*, 853 F.2d 418, 425 (6th Cir. 1988)).

Qualified immunity is a two-step analysis: this Court must determine "whether the officers violated [Plaintiffs'] constitutional rights, and if so whether those rights were clearly established at the time." *Smith v. Stoneburner*, 716 F.3d 926, 929 (6th Cir. 2013) (citing *Pearson*, 555 U.S. at 236). In this context, "clearly established" means "at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

"A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which

24

the alleged constitutional violation occurred." *Durham v. Nu'man*, 97 F.3d 862, 866 (6th Cir. 1996). "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (quoting *Wesby*, 138 S. Ct. at 590). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citation omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts must "define the clearly established right at issue on the basis of the specific context of the case." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks omitted).

At step one, the Court has little doubt that Plaintiffs' constitutional rights were violated, for substantially the reasons stated in the preliminary injunction ruling. As the Court previously explained, significant delay in bringing a forfeiture proceeding can rise to the level of a due process violation under the Fifth and Fourteenth Amendments.[12] *See United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 565 (1983). Such claims are governed by the *Barker v. Wingo* balancing test. 407 U.S. 514 (1972). The four factors to be weighed are "the length of the delay, the reason for the delay, the claimant's assertion of his right, and the prejudice to the claimant." *United States v. Ninety Three Firearms*, 330 F.3d 414, 424–25 (6th Cir. 2003) (citing *Barker*, 407 U.S. at 530). The "'triggering mechanism'" and "overarching factor is the length of the delay." *$8,850*, 461 U.S. at 565 (quoting *Barker*, 407 U.S. at 530). The Supreme Court has found a delay of 18 months to be "quite significant," *Id.*, and has remarked that

---

[12] The Fifth Amendment Due Process Clause has been "incorporated into the Fourteenth." *Ingraham v. Wright*, 430 U.S. 651, 672 (1977).

"the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992).

The delay in this case—from the seizure of Plaintiffs' property in January 2018 to the second indictment in August 2019—was deemed "substantial and presumptively prejudicial" in the Court's preliminary injunction ruling. (ECF No. 31 at 19). Addressing the other *Barker* factors, the Court found that "[t]he Chillicothe Police Department acted diligently in investigating the case . . . [b]ut from November 9, 2018, when Officer Taczak submitted the case to the prosecutor, the Chillicothe Defendants have offered no explanation for the delay in bringing the indictment, other than being overworked and understaffed." (*Id.* at 20).[13] Even though Plaintiffs did not initiate a hearing under O.R.C. § 2981.03(A)(4), the Court wrote that Plaintiffs "adequately asserted their rights to the property" by making written requests to the Chillicothe Law Director and by filing the state-court action for replevin. (ECF No. 31 at 21). Finally, the Court found Plaintiffs were entitled to a presumption of prejudice since "Defendant's failure to bring a forfeiture specification in a timely manner was due to negligence." (*Id.* at 22). Balancing the factors, the Court concluded that the *Barker* test favored Plaintiffs. (*Id.* at 22–24).

The fact remains: "Due process requires a meaningful hearing within a meaningful time." (*Id.* at 24). The Court was, and still is, "at a loss to comprehend the state's failure to file in a timely

---

[13] November 9, 2018, is the date listed on the "case jacket." (Hr'g Ex. D-1). Plaintiffs attempt to make this a disputed fact by pointing to Detective Taczak's affidavit preceding the preliminary injunction hearing, in which she attested: "In approximately October of 2018, I completed my investigation and submitted it to the Ross County Prosecutor for charges." (ECF No. 13-1 ¶ 13). Plaintiffs repeatedly assert that Detective Taczak lied about the November date. (ECF No. 123 at 12–14). But her testimony is consistent: November 9 is "approximately" October. Furthermore, Detective Taczak explained at the preliminary injunction hearing that the affidavit in question was drafted in haste, while she was in another trial and lacked access to the files that would refresh her recollection. (ECF No. 36, Tr. 74:8–75:3).

manner civil forfeiture or request forfeiture in the first indictment." (*Id.*). Thus, the *Barker* analysis in the preliminary injunction ruling continues to show a constitutional violation.

Even so, genuine issues of material fact remain regarding *who* is accountable for the deprivation. As will be discussed in the next subsection, Defendants have attempted to shift responsibility onto the Ross County Prosecutor, a non-party in this action. The Court's due process concerns stem from the delay *after* Detective Taczak submitted the case to the prosecutor, and the extent of Defendants' involvement therein is a factual dispute that cannot be resolved on summary judgment. This alone would preclude summary judgment on grounds of qualified immunity. *See Hamilton v. Myers*, 281 F.3d 520, 531 (6th Cir. 2002) ("Although the application of qualified immunity comprises a legal issue, summary judgment is inappropriate when conflicting evidence creates subordinate predicate factual questions which must be resolved by a fact finder at trial."); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) ("Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.").

Assuming, momentarily, that the due process violation rests on Defendants' shoulders, the Court proceeds to step two: whether the right was clearly established at the time of the violation. "It is Plaintiffs' position that *$8,850* made it clearly established that Plaintiff James Cremeans had a constitutional right for defendants to file a petition for forfeiture (mere form) before 23 months." (ECF No. 123 at 18 (emphasis original)).[14] The Court concurs.

In that case, federal customs agents seized the infamous $8,850, which a traveler had failed to declare in violation of the Bank Secrecy Act. *$8,850*, 461 U.S. at 557–58. The claimant promptly

---

[14] How Plaintiffs divined 23 months is unclear. By the Court's calculation, the delay was 19 months and 6 days: from January 10, 2018, to August 16, 2019. Regardless, the delay at issue in *$8,850* was 18 months (shorter than this case by either measure), so the discrepancy is not of consequence.

filed a "petition for remission or mitigation" with the Customs Service. *Id.* at 558–59. Meanwhile, special agents investigated whether the seized currency was connected to narcotics. *Id.* at 559. Approximately 9 months after the seizure, the investigation culminated in a criminal indictment on two counts: a felony count for making false statements, and a misdemeanor count (including criminal forfeiture) for the reporting violation. *Id.* at 560. At trial, about 6 months later, the claimant was convicted of the felony and acquitted of the misdemeanor. *Id.* Another 3 months after the verdict, the Customs Service initiated civil forfeiture proceedings. *Id.* at 560. The claimant raised affirmative defenses "that the Government's 'dilatory processing' of her petition for remission or mitigation and 'dilatory' commencement of the civil forfeiture action violated her right to due process." *Id.* at 561.

The Supreme Court applied the *Barker* factors, first noting that "the delay here—some 18 months—[was] quite significant. Being deprived of this substantial sum of money for a year and a half is undoubtedly a significant burden." *Id.* at 565. The Court also observed, though, that the case required a complex investigation and that the government acted diligently at all stages. *Id.* at 568. On the remaining factors, the Court found that the claimant did not pursue all judicial remedies and had not shown prejudice from the delay. *Id.* at 569. Balancing the factors, the Court concluded:

> In this case, the balance of factors indicates that the Government's delay in instituting civil forfeiture proceedings was reasonable. Although the 18-month delay was a substantial period of time, it was justified by the Government's diligent efforts in processing the petition for mitigation or remission and in pursuing related criminal proceedings. [Claimant] never indicated that she desired early commencement of a civil forfeiture proceeding, and she has not asserted or shown that the delay prejudiced her ability to defend against forfeiture. Therefore, the claimant was not denied due process of law.

*Id.* at 569–70.

The Ohio Supreme Court—also a source of controlling authority, *see Durham*, 97 F.3d at 866—endorsed the four factors of *Barker* and *$8,850* in the case *State v. Baumholtz*, 553 N.E.2d 635 (Ohio 1990). There, the court considered a delay of 5 and a half months between the sheriff's seizure of an automobile (allegedly used in the commission of a drug offense) and commencement of forfeiture proceedings. *Id.* at 635–36. The court found the delay to be "significant" and "unreasonable," since the state "failed to set forth credible reasons for such a lengthy delay." *Id.* at 639–40. Even though the claimant had not clearly asserted her right to a timely hearing or shown prejudice from the delay, making for a "close case," the court found in the claimant's favor. *Id.* at 640. The court gave "great weight" to "both the length of the delay and the lack of any credible reasons for the failure to promptly file a forfeiture petition." *Id.*

Defendants seek to cabin *$8,850* for three reasons: it arises in the customs context, it lacks an applicable state-law remedy, and "the property was not being held subject to an investigation for a separate criminal offense." (ECF No. 130 at 6–7). The first point improperly demands an exact match between the cited case and the conduct at issue, *contra al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). It also overlooks *Baumholtz*, discussed in Plaintiffs' brief, which is even closer factually.[15] The second point is contrary to the Court's holding at the preliminary injunction stage, discussed in greater detail *infra* Section III.B.4, that the adequacy of state remedies is not at issue in this action. (*See* ECF No. 31 at 10–12). Additionally, the claimant

---

[15] *Baumholtz* did apply an earlier version of Ohio's forfeiture statute, as Defendants note in passing. (*See* ECF No. 130 at 7 n.1). The current version is codified at O.R.C. § 2981.03, last amended in 2017, whereas *Baumholtz* considered O.R.C. § 2933.43, repealed in 2007. In *Baumholtz* and here, however, the issue is what the statute *lacks*: neither version provides a specific timeframe in which the State must initiate a forfeiture action. *Compare Baumholtz*, 553 N.E.2d at 636 (discussing this omission in O.R.C. § 2933.43), *with* O.R.C. § 2981.03. In this respect, the statutory schemes are alike.

in *Baumholtz* prevailed without any evidence that she asserted her rights, whereas Plaintiffs made multiple demands and filed a replevin action. 553 N.E.2d at 639. The last point neglects that in *$8,850*, much like the present case, special agents also were investigating whether the seized currency was connected to drug smuggling. 461 U.S. at 559.

Together, *$8,850* and *Baumholtz* clearly establish that there is a due process right to a forfeiture proceeding within a reasonable time, which will be violated if delays exceed more than a few months without legitimate explanation. That is the case at hand. In the first 10 months, while Defendants diligently investigated the suspected drug offenses, it was reasonable to think that *Barker* and *$8,850* would forgive their delay. Once Detective Taczak submitted the file to the prosecutor, however, it languished another 9 months with no forfeiture specification. To this day, Defendants have offered no credible explanation for the latter half of the 19-month delay. Their instant Motion simply lays the problem at the prosecutor's foot. (*See* ECF No. 110 at 14). Under these circumstances, reasonable officers would have known that Plaintiffs had been deprived of their property without due process of law. Therefore, Defendants are not entitled to summary judgment on grounds of qualified immunity.

### 3.  Personal Involvement

Defendants next contend that "[e]ven if there is a Fourteenth Amendment violation, it was not caused by the named Defendants." (*Id.* at 15–17). Defendants plead "they had <u>no</u> personal involvement in the delay once the investigation concluded and was submitted to the prosecutor." (*Id.* at 16 (emphasis original)). Importantly, as illustrated in the preliminary injunction ruling, this Court's due process concerns arise from the delay *after* that point:

> The Chillicothe Police Department acted diligently in investigating the case. From January 10, 2018, when the search warrant was executed and the property seized, to June 2018, Officer Taczak was issuing subpoenas and waiting for responses. From June to September, the Chillicothe Police Department was compiling the

case. This is a reasonable amount of time to expect law enforcement to compile the results of their investigation.

But from November 9, 2018, when Officer Taczak submitted the case to the prosecutor, the Chillicothe Defendants have offered no explanation for the delay in bringing the indictment, other than being overworked and understaffed. . . . The Chillicothe Defendants have attempted no explanation for the omission of a forfeiture count in the first indictment or for the additional delay before the second indictment. Thus, it appears that the Defendant's failure to bring a forfeiture specification in a timely manner is due to negligence.

(ECF No. 31 at 20).

By Defendants' account, after November 9, 2018, the City merely "was storing the evidence for the prosecutor" and "lacked any authority to return the property." (ECF No. 110 at 16). "Personal involvement is necessary to establish section 1983 liability," so this defense is complete if proven. *Murphy*, 406 F. App'x at 974 (citing *Gibson*, 926 F.2d at 535).

The degree of Defendants' involvement, however, is less than clear. Beyond Chief Washburn's own Declaration (ECF No. 110-3), Defendants submit no evidence that they lacked control or authority over the property after the case was submitted to the prosecutor. Other parts of the record, when construed in Plaintiffs' favor, do suggest that Defendants had meaningful involvement after the case was submitted to the prosecutor. A letter from the City Law Director dated January 16, 2019, reads: "*Detective Taczak* indicated that the Cremeans' dashboard camera *may now be returned* and requested you contact *their office* . . . to make arrangements." (ECF No. 123-3 (emphasis added)). This presumably came in response to one of Plaintiffs' several requests for return of their property, made to "Defendant Chief Keith Washburn and other City officials." (ECF No. 4 ¶¶ 29, 33). Additionally, the "Evidence/Property Room Log" records multiple "Returns" while the case was with the prosecutor, each signed "Taczak." (ECF No. 86-1 at 2 (entries of 5/8/20 and 5/19/20)). Detective Taczak also signed the final return, after criminal charges were dismissed. (*Id.* (entry of 3/19/21)). Finally, it is undisputed that the City had the

ability to institute its own forfeiture proceedings under O.R.C. § 2981.03, then, if necessary, seek a stay pending criminal indictment. (*See* ECF No. 123 at 10, 13–14 (discussing this practice)). Defendants argue only that they were not "required" to do so. (ECF No. 130 at 10).

As a final note, the personal involvement defense is somewhat at odds with Defendants' positions at earlier stages of this litigation. At the preliminary injunction hearing, when Plaintiffs' case file rested with the Ross County Prosecutor, Defendants "agreed to stipulate that the property is still in the custody of the city of Chillicothe and the police department." (ECF No. 37, Tr. 39:3–9). "Custody" does not necessarily mean control; but if Defendants "*did not even have the authority to return the property*" (ECF No. 110 at 16 (emphasis original)), one would expect that argument to feature prominently in Defendants' opposition to a preliminary injunction. It did not. (ECF No. 37, Tr. 52:25–60:4; *see also* ECF No. 13). Nor did Defendants raise their lack of authority as a basis for staying or clarifying the Court's order to return specific property. (*See* ECF Nos. 35 & 47). Defendants certainly are not precluded from making these arguments now; but it does leave their claim of "scrivener's error" in the Court's preliminary injunction ruling (to wit, by referring to "Defendants" failing to bring a forfeiture specification, rather than "the County Prosecutor") an audacious one. (ECF No. 110 at 17 n.7, 20 n.9).

In sum, the evidence does not show decisively that Defendants can disclaim responsibility after November 9, 2018. Their involvement in the ensuing delay remains a triable issue, so summary judgment is improper.

### 4. *State Remedies*

Defendants also argue that Plaintiffs' claims are precluded by the availability of adequate state remedies. (ECF No. 110 at 18–21). Specifically, Plaintiffs had the ability under O.R.C. § 2981.03(A)(4) to file a motion for return of their property and obtain a hearing within 21 days.

The Court considered this issue in depth during the preliminary injunction stage, ultimately finding

for Plaintiffs:

> The alleged due process violation here occurred as a result of established state process. The Cremeans have argued that Ohio does not provide an adequate remedy because Ohio law does not provide a timeframe in which the state is required to bring a forfeiture action. Thus, the Chillicothe Police Department's and Ross County prosecutor's actions were not random or unauthorized, and *Parratt* [*v. Taylor*, 451 U.S. 527 (1981)] does not apply. *Rodgers v. 36th Dist. Court*, 529 F. App'x 642, 650 (6th Cir. 2013) (finding that plaintiffs were not required to show inadequacy of state remedies where the claims giving rise to the alleged due process claim arose from conduct that defendants believed was justified under the parties' CBA). The underlying logic of the *Parratt* rule supports this conclusion. *Parratt* excuses pre-deprivation remedies where such "remedies are impossible." *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991). Here, however, Ohio has the opportunity to provide plaintiffs like the Cremeans with adequate process—a forfeiture proceeding. Thus, the Cremeans are not required to show inadequacy of state procedure before bringing their § 1983 claim for violation of due process.

(ECF No. 31 at 11–12).

Then, ruling on Defendants' Motion to Stay, the Court again considered whether it "was

required to apply the *Vicory-Parratt* line of cases requiring the exhaustion of state remedies"—as

in *Great Elk Dancer for his Elk Nation v. City of Logan*, 129 F. Supp. 3d 546, 549 (S.D. Ohio

2015)—"because Plaintiffs allege that the property deprivation was a result of 'alleged

unauthorized conduct.'" (ECF No. 45 at 4).

> Not so. As this court indicated in its order granting the preliminary injunction, Plaintiffs are alleging that they have suffered a constitutional violation as a result of a delay in bringing a forfeiture proceeding because Ohio law does not provide a timeframe in which the state is required to bring a forfeiture action. (ECF No. 1 at 5-6). They are not alleging, as the plaintiff did in *Great Elk Dancer*, that defendants applied existing laws in an unconstitutional manner due to plaintiff's nationality. (ECF No. 43 at 3; No. 42-1) (quoting *Great Elk Dancer* and noting that in that case, police "wrongfully served, a search warrant."); *see also Great Elk Dancer*, 129 F. Supp. 3d 546, 549 (S.D. Ohio 2015). Instead, Plaintiffs allege that the state's policy of holding seized property "from the citizenry for all eternity" pending an "ongoing investigation" is unconstitutional because it constitutes a "deprivation of property caused by conduct undertaken pursuant to established state procedures." (ECF No. 1 at 5-6). Thus, Defendants have failed to show that *Great Elk Dancer* applies in this instance.

(*Id.*).

Defendants correctly note that these preliminary rulings do not bind the Court on summary judgment. (ECF No. 130 at 10–11). *See Tri Cty. Wholesale Distribs. v. Labatt U.S. Operating Co.*, 66 F. Supp. 3d 974, 981 (S.D. Ohio 2014) ("the law-of-the-case doctrine does not generally apply to preliminary injunction decisions"). Most of their present arguments, however, track those that the Court rejected in the above-quoted rulings. Defendants' sole new argument seizes on references to "negligence" in the Court's preliminary injunction ruling to claim "that this is a case about random, unauthorized conduct of state actors—specifically, the Ross County Prosecutor." (ECF No. 110 at 19). This can be addressed in short order. References to "negligence," made in the context of *Barker* balancing, do not mean that the acts were "random" or "unauthorized." The same opinion explicitly stated: "Thus, the Chillicothe Police Department's and Ross County prosecutor's actions were *not random or unauthorized*, and *Parratt* does not apply." (ECF No. 31 at 11–12 (emphasis added)).

Absent other new evidence or argument, the Court has no grounds to diverge from its earlier holdings. "Inconsistency is the antithesis of the rule of law." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996). Therefore, the Court again holds that Plaintiffs are not required to show exhaustion or inadequacy of state remedies.

### 5. *Municipal Liability*

Defendants next request summary judgment for claims against the City. Per the seminal case *Monell v. Department of Social Services*, a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents"; rather, the injury must be inflicted by "execution of a government's policy or custom." 436 U.S. 658, 694 (1978). "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence

of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

The Amended Complaint supports a claim under the first theory, "official policy." (*See* ECF No. 4 ¶¶ 24–25, 30–32). As Plaintiffs frame it in their response brief: "Plaintiffs alleged that the City continued to hold the property at issue due to its policy that they could hold it if there was a 'continuing' or 'ongoing' investigation." (ECF No. 123 at 19). The Amended Complaint does not evince any theories of ratification, inadequate training or supervision, or custom of tolerance or acquiescence.[16] An "official policy" claim, though, is consistent with Plaintiffs' theory of the case, endorsed in the Court's preliminary injunction ruling, that "[t]he alleged due process violation here occurred as a result of established state process." (ECF No. 31 at 11).

As such, the Court must reject Defendants' position that "there is no *Monell* claim" pled. (ECF No. 110 at 31). Only one other argument is made against municipal liability: that "the City cannot be held liable under *Monell* absent an underlying constitutional violation." (*Id.*). This rises or falls with Defendants' primary arguments, which the Court already has rejected. Plaintiffs' claims against the City will remain.

### 6. *Damages and Relief*

Finally, the Court arrives at damages, an issue which received negligible attention in the parties' summary judgment motions. Plaintiffs' Motion gives no definitive figure for monetary

---

[16] Plaintiffs' brief does contain a singular reference to "custom and non-action." (ECF No. 123 at 19). Insofar as Plaintiffs intend to assert a custom theory, Defendants correctly raise the dearth of evidence (or even allegations) on "any pattern of similar incidents." (ECF No. 130 at 14). That deficiency is fatal. *See Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996) ("inaction" theory requires "a clear and persistent pattern" of illegal activity).

damages, stating only that they are "well into six figures" (ECF No. 94 at 19 n.7); and it does not brief the requests for declaratory or permanent injunctive relief. Defendants, meanwhile, make a single passing reference to mootness now that Plaintiffs' property has been returned. (ECF No. 110 at 9). Plaintiffs did brief remedies in their combined response and reply (ECF No. 123 at 33–38), and Defendants moved to strike the arguments as untimely claims for summary judgment. (ECF No. 131). Plaintiffs clarified that they were not raising any new issues, but rather responding to Defendants' mootness claim. (ECF No. 132 at 1–3).

With this understanding, the remedies section of Plaintiffs' response brief is permissible, and Defendants' Motion to Strike is **DENIED**. Furthermore, since neither Motion for Summary Judgment develops the remedies issue in sufficient depth, the Court is disinclined to narrow the available relief at this stage. Damages and non-monetary relief, if any, will remain an open issue.

\* \* \*

To summarize, several factual disputes preclude summary judgment on Plaintiffs' due process claims. Thus, both Motions for Summary Judgment are **DENIED** as to Count II. In the interest of focusing the parties' attention and avoiding further ancillary disputes, these are the core triable issues in the Court's view: (1) whether Detective Taczak and Chief Washburn were personally involved in the delay after November 9, 2018, such that they could be liable for violating Plaintiffs' due process rights; (2) whether the City of Chillicothe is liable under *Monell* for an illegal official policy of holding seized property without initiating timely forfeiture proceedings; and (3) what remedies, if any, Plaintiffs are entitled to receive.

## IV.  CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment (ECF No. 94) is **DENIED**. Defendants' Motion for Summary Judgment (ECF No. 110) is **GRANTED** as to Count

I and **DENIED** as to Count II. Plaintiffs' Motion to Compel Discovery (ECF No. 112) is **DENIED**, and Defendants' Motion to Strike (ECF No. 131) is **DENIED**. A trial order will issue under separate cover.

       **IT IS SO ORDERED.**

                             **ALGENON L. MARBLEY**
                             **CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: August 17, 2022**